UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| KEVIN A. TOMSHACK, | 4:20-CV-04037-RAL |
| Plaintiff, | |
| vs. | OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| ROBERT WILKIE, SECRETARY, UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; AND UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, | |
| Defendants. | |

Kevin Tomshack, a twenty-six-year veteran of the United States Airforce, brought this employment discrimination action under the Americans with Disabilities Act ("ADA"), the ADA Amendments Act of 2008, and the Rehabilitation Act of 1973. Doc. 1 at 1–2; Doc. 27 at 1. He alleges that his former employer, the Royal C. Johnson Veterans' Memorial Hospital ("Veterans' Hospital"), terminated his employment because of his disability, failed to make reasonable accommodations for his disability, and retaliated against him for requesting an accommodation. Doc. 1 at 2, 10–11. Tomshack requests back pay and the value of lost benefits, money damages for emotional distress, and attorneys' fees and costs. Doc. 1 at 11. The United States Department of Veterans Affairs and Robert Wilkie, Secretary of the United States Department of Veterans Affairs, ("Defendants") filed a motion for summary judgment, Doc. 16, which this Court now grants.

1

## I.    Facts

Tomshack suffered injuries during his military service in Kuwait and Kyrgyzstan. Doc.

1 at 2–3.  In 2012, after Tomshack had retired from the Airforce, he accepted a job as a janitor at the Veterans' Hospital.  Doc. 1 at 3; Doc. 6 at 2; Doc. 17 at 2; Doc. 18 at 1.  Sometime in 2014, Tomshack had surgery to fuse his C-3, C-4, and C-5 vertebrae. Doc. 26-1 at 3. In December 2014, he was diagnosed with idiopathic thrombosis, rendering him unable to continue working as a janitor in a hospital setting.  Doc. 17 at 2; Doc. 18 at 1; Doc. 19-1 at 4–5.  Sometime between his diagnosis and May 2015, the Veterans' Hospital transferred Tomshack to a full-time file clerk position in its Care in the Community Department.  Doc. 1 at 3; Doc. 17 at 2; Doc. 18 at 1.  Lisa Seeley was Tomshack's supervisor there.  Doc. 1 at 2; Doc. 6 at 2.

At that time, the Veterans' Hospital was in the process of scanning thousands of paper medical records.  Doc. 1 at 3; Doc. 19-1 at 5.  Tomshack's primary responsibility was to scan these records and upload them to the computer system. Doc. 17 at 2; Doc. 18 at 2.  Tomshack began to suffer neck spasms at work when he stared at a computer screen for too long, which became worse over time.  Doc. 19-1 at 6–8.  Tomshack also suffered from lower back issues, post-traumatic stress disorder, depression, and degenerative joint and disk disease.  Doc. 1 at 3.  His back and neck issues made it difficult for him to sit, stand, or walk for extended lengths of time.  Doc. 26-1 at 3; Doc. 27 at 15.

Tomshack gradually found it more difficult to work full-time.  Doc. 26-1 at 5.  In August 2015, Tomshack had a second cervical spinal surgery that fused his C-6 and C-7 vertebrae, but the surgery failed to alleviate his symptoms.  Doc. 1 at 3; Doc. 19-1 at 8; Doc. 26-1 at 3, 5.  Around this time and for approximately two years thereafter, Seeley and the Veterans' Hospital allowed Tomshack to work what was effectively a part-time schedule by using sick leave, annual leave,

2

compensatory leave, and leave under the Family Medical Leave Act (FMLA) to reduce his weekly hours. Doc. 1 at 3; Doc. 17 at 2; Doc. 18 at 3–4. Once Tomshack was out of leave, Seeley and the Veterans' Hospital let him take leave without pay. Doc. 17 at 2. Seeley initially granted Tomshack this flexibility because his work did not need to be completed within traditional business hours. Doc. 17 at 2; Doc. 18 at 4; Doc. 19-2 at 2. Tomshack's part-time schedule was somewhat of an informal accommodation in that he remained employed full-time despite working reduced hours.

By September 2015, Tomshack had finished scanning the document backlog, so Seeley instructed him to begin "consult tracking." Doc. 1 at 3; Doc. 27 at 3. Consult tracking is one of the roles of program support assistants. Doc. 1 at 3. It involves updating a veteran's medical records after the veteran is seen by a care provider outside of the Veterans' Hospital system. Doc. 1 at 3–4; Doc. 27 at 3. Consult tracking also requires documenting when a veteran who is referred for a consultation does not receive care. Doc. 1 at 5.

Although Tomshack had begun consult tracking in 2015, it was not until February 7, 2016, that he was officially promoted from a full-time file clerk to a full-time program support assistant in the Care in the Community Department. Doc. 17 at 2; Doc. 18 at 2. Despite continuing in a full-time position, Tomshack actually worked, with permission, a part-time schedule by using sick leave, annual leave, compensatory leave, leave under the FMLA, and eventually leave without pay. Doc. 17 at 2; Doc. 18 at 4.

In 2015 and 2016, Seeley gave Tomshack very positive performance reviews, and he received written awards, promotions, and cash bonuses. Doc. 1 at 4; Doc. 6 at 3. On his November 2016 performance review, Tomshack had five "exceptional" ratings and one "highly successful" rating. Doc. 1 at 4. The review stated that Tomshack was very accurate and a "subject matter

3

expert for scanning." Doc. 1 at 4. He also had "exemplary skills in all aspects of customer service . . . [, went to] extra lengths to secure documentation when needed in a timely manner," worked well with other members of his department, and was "independent and effective in managing his very high workload." Doc. 1 at 4. Tomshack's "highly successful" grade was in the "Personal Mastery" section, which noted that he "had four documented episodes of unplanned leave for medical reasons." Doc. 1 at 4.

On January 5, 2017, Tomshack sent an email to human resources stating that his medical issues made even part-time work difficult and inquiring about early medical retirement. Doc. 32 at 1, 4. On January 10, 2017, human resources officer Angyla Lewis met with Tomshack to answer his questions and give him the forms that he would need to complete. Doc. 32 at 1–2. Tomshack never returned the paperwork for early medical retirement to human resources. Doc. 32 at 2.

Around late 2016 and into early 2017, the national priorities of the Veterans Affairs Administration ("VA") shifted to focus on scheduling consultations for veterans within 30 days of when a referral is made. Doc. 19-2 at 12–13; Doc. 26-2 at 10. Around this time, VA evaluations became more focused on the number of appointments scheduled, rather than the number of open consults. Doc. 1 at 5.

After working as a GS-5 program support assistant for one year, Tomshack was promoted to GS-6 on February 5, 2017. Doc. 1 at 5; Doc. 17 at 3; Doc. 18 at 2; Doc. 24 at 2. Around the time of his promotion and consistent with the VA's new focus, the Veterans' Hospital began expecting Tomshack to schedule appointments for veterans. Doc. 17 at 3; Doc. 18 at 2, 4; Doc. 19-1 at 10. Under the "Major Duties and Responsibilities" section of the program support assistant job description, "scheduling" is the first task described, and the term "scheduling" appears in seven of the twenty-two bullet points listed under this section. Doc. 20-7 at 4–5. Scheduling involves

4

communicating with a veteran and then calling a health care clinic to schedule that veteran's appointment. Doc. 19-2 at 2. Because scheduling involves calling health care clinics, it typically must occur during normal business hours, although calls to veterans can be made outside of business hours. Doc. 19-2 at 2.

On March 6, 2017, Grace Wilson, a human resources training specialist at the Veterans' Hospital, emailed Tomshack's direct supervisor Josue Torres to ask if he had "any idea when [Tomshack] would be retiring?" and whether Tomshack had begun "schedul[ing] any app[ointments] at all?" Doc. 26-1. Torres responded that Tomshack had not done any scheduling and hoped to retire around May 2017. Doc. 26-1.

In May 2017, Tomshack was told that he needed to complete a mandatory training so that he could begin to schedule appointments. Doc. 1 at 5; Doc. 17 at 3; Doc. 18 at 3; Doc. 24 at 2. The training was scheduled to take place for eight hours a day over a two-week period. Doc. 26-2 at 5. After the mandatory training was complete, Tomshack and other program support assistants would receive electronic "keys" that would allow them to access the VA's scheduling software. Doc. 17 at 3; Doc. 18 at 2; Doc. 19-2 at 4. By the end of May 2017, all employees who were assigned to schedule in the Care and the Community Department had completed training except for Tomshack. Doc. 19-2 at 9.

Tomshack recalls asking Seeley if he could complete the training in half-day increments because he was not able to work a full day. Doc. 27 at 5–6. According to Tomshack, Seeley told him that he needed to attend the full eight-hour training days and after that he would need to begin working eight hours a day, instead of his current four-hour-a-day work schedule. Doc. 1 at 5; Doc.

26-1 at 8. Seeley did not recall having any such conversations with Tomshack.[1] Doc. 26-2 at 5.
There is no record that Tomshack submitted a formal accommodation request to attend the training
a half-day at a time, and Tomshack made no such request to the trainer Wilson. Doc. 21 at 1.

On July 17, 2017, when Tomshack's leave reserves were almost depleted, he submitted a
written accommodation request to work part-time. Doc. 1 at 6; Doc. 17 at 3–4; Doc. 18 at 4. At
that time, there was another employee who had expressed interest in job sharing with Tomshack,
where both could work part-time as program support assistants. Doc. 1 at 6. On August 29, 2017,
while his accommodation request was pending, Tomshack's immediate supervisor Torres told him
that he could no longer take leave without pay or unauthorized leave. Doc. 27 at 18.

On September 18, 2017, Equal Employment Opportunity (EEO) Manager Diane Maeschen
and Seeley met Tomshack to discuss his accommodation request. Doc. 17 at 4; Doc. 18 at 5. They
reminded him that he had not completed training to do scheduling, Doc. 17 at 4; Doc. 18 at 5, and
informed him that there were no part-time positions in the Care in the Community Department but
that he could pursue a part-time position in another department. Doc. 19-1 at 16–17; Doc. 19-2 at
6. Tomshack stated that an alternative position suggested to him involved "answering phone calls
. . . in the basement," which to him did not seem like meaningful work. Doc. 19-1 at 17.

Maeschen and Seeley had a follow-up meeting with Tomshack on October 3, 2017, during
which they officially denied his accommodation request, restated that there were no part-time
positions for his current role in the Care in the Community Department, and reminded him of the
need to complete scheduling training. Doc. 17 at 4; Doc. 18 at 5. They provided a written decision
stating that Tomshack's requested "accommodation would require removal of an essential function

---

[1] Taking the facts in the light most favorable to Tomshack as the party opposing summary
judgment, this Opinion and Order presumes that Tomshack's recollection is accurate.

6

of the job" and "would require lowering of a performance or production standard." Doc. 1 at 6. Contemporaneously with denying his request, Maeschen and Seeley offered Tomshack a part-time position in another department.   Doc. 17 at 5; Doc. 18 at 6. Tomshack rejected this alternative, stating he only wanted a part-time position in the Care in the Community Department. Doc. 17 at 5; Doc. 18 at 6.

In the written denial of the accommodation request, the Defendants stated that they would "review other options" if Tomshack completed the training. Doc. 17 at 4; Doc. 18 at 6. Although not included in the written decision, Seeley testified that she did not believe job sharing would be a viable option because it required two employees to negotiate when they took time off with each other and job sharing had not been successful in other departments. Doc. 26-2 at 6. After speaking with human resources, Seeley did not believe that Tomshack would be able to negotiate when he took time off with another employee because his disability made it difficult to stick to a consistent schedule. Doc. 26-2 at 6.

Tomshack received a negative performance evaluation on November 6, 2017. Doc. 1 at 6. On November 17, 2017, Seeley met with Tomshack and gave him a Notice of Performance Deficiencies stating that he had not performed the required duties of his position and that training would take place on November 20, 2017, which "he must attend or be removed." Doc. 17 at 5; Doc. 18 at 6.

According to Seeley's emails on November 20, Tomshack opted to resign during his meeting with her that morning and then asked if he could delay resignation until January 6, 2018. Doc. 26-9 at 3. That day, Seeley emailed human resources officer Betsy Geiver to inquire if Tomshack could delay his resignation as requested. Doc. 26-9 at 2. Seeley wrote that Tomshack "had been a good employee-until he wasn't," but she would be fine if he resigned now or in January

7

2018. Doc. 26-9 at 2. Geiver replied, "I'm just not sure we can let [Tomshack] continue to not schedule and perform the duties he's supposed to be doing." Doc. 26-9 at 2. That same day, Associate Director of Patient Care Services Barbara Teal emailed Seeley stating, "[i]f there are performance/conduct issues, we would not delay [Tomshack's] resignation." Doc. 26-9 at 3.

Tomshack did not submit a formal accommodation request related to the mandatory training on November 20, 2017, and did not attend the training. Doc. 17 at 5; Doc. 18 at 3, 6; Doc. 19-1 at 15. Tomshack recalls that on November 22, 2017, Seeley told him again that unless he began working full-time, he must resign or be fired. Doc. 1 at 6; Doc. 27 at 7. Seeley denies this.[2] Doc. 6 at 3; Doc. 26-2 at 11.

On November 22, 2017, Tomshack emailed Seeley a letter stating that he had been working a part-time schedule for about two years, had no desire to leave the employment of the VA, was unable to retrain due to being unable to attend eight-hour training sessions and work eight hours a day. Doc. 1 at 6; Doc. 19-10. Tomshack maintains that he was constructively discharged, and thus felt forced to resign immediately. Doc. 1 at 6.

Tomshack had a 90% disability rating when he resigned. Doc. 27 at 3. He had not scheduled any appointments independently because he never completed the training to get access to the scheduling software. Doc. 17 at 3; Doc. 18 at 3; Doc. 19-1 at 10. Tomshack was the only program support assistant who did not complete the scheduling training. Doc. 19-2 at 9. On November 29, 2017, he submitted an application for Social Security Disability, which was later approved. Doc. 17 at 5; Doc. 18 at 7.

---

[2] Because Tomshack is the non-movant opposing summary judgment, this Court presumes that Seeley actually made such a statement.

8

On January 11, 2018, Tomshack filed an EEO complaint, which was received by the VA Office of Employment Discrimination Complaint Adjudication. Doc. 1 at 7; Doc. 6 at 2. The complaint alleged discrimination based on disability, failure to accommodate, and retaliation. Doc. 1 at 7. On September 20, 2019, the VA Office of Resolution Management requested a final action decision on the complaint from the VA Office of Employment Discrimination Complaint Adjudication. Doc. 1 at 8. No final action decision had been reached by the time this action commenced on February 25, 2020, over two years after Tomshack filed his EEO complaint. Doc. 1 at 8.

## II. Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials" in his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Gacek v. Owens & Minor Distribution, Inc., 666 F.3d 1142, 1145 (8th Cir. 2012); see also Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005). To establish that a material fact is genuinely disputed, the party opposing summary judgment must "cit[e] to particular parts of materials in the record" that establish a genuine dispute or "show[] that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1)(A), (B). In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986).

"The ADA makes it unlawful for a covered employer to discriminate against any qualified individual on the basis of disability." E.E.O.C. v. Prod. Fabricators, Inc., 763 F.3d 963, 969 (8th Cir. 2014) (cleaned up and citation omitted). "The United States is not a covered employer under the ADA." Gesinger v. Sebelius, No. CIV 13-1004, 2014 WL 793795, at *2 (D.S.D. Feb. 26, 2014) (citing 42 U.S.C. § 12111(5)(B)(I)). "Federal employers are prohibited from engaging in discrimination based on physical or mental disability by §§ 501 and 504 of the Rehabilitation Act of 1973 . . . ." 5 EMPLOYMENT COORDINATOR EMPLOYMENT PRACTICES § 20:83, Westlaw (updated December 2021); see also 29 U.S.C. § 794. As such, Tomshack's claim is properly brought under the Rehabilitation Act. However, case law interpreting the ADA guides analyzing Rehabilitation Act claims because the laws are "similar in substance." Argenyi v. Creighton Univ., 703 F.3d 441, 448 (8th Cir. 2013); see also Durand v. Fairview Health Servs., 902 F.3d 836, 841 (8th Cir. 2018).

The Rehabilitation Act incorporates the enforcement provisions of Title VII to disability discrimination claims. See 29 U.S.C. § 794a(2) ("The remedies, procedures, and rights set forth in title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."); 5 EMPLOYMENT COORDINATOR EMPLOYMENT PRACTICES § 20:83, Westlaw (updated December 2021). Title VII allows a federal employee to bring a civil action "after one hundred and eighty days from the filing of the initial charge with the [employing] department, agency, or unit . . . ." 42 U.S.C. § 2000e-16(c); see also Murthy v. Vilsack, 609 F.3d 460, 465 (D.C. Cir. 2010) (citing 42 U.S.C. § 2000e-16) ("[A] federal employee must wait 180 days, absent final action by the EEOC, before filing a lawsuit . . . ."). Tomshack filed this action more than two years after he submitted his EEO complaint, which was

10

received by the VA Office that adjudicates such claims. Doc. 1 at 7. Therefore, this Court has jurisdiction over Tomshack's claims.

"Discrimination under the ADA and the Rehabilitation Act encompasses both disparate treatment because of a disability and failure to provide reasonable accommodations to a qualified individual's known disability." Withers v. Johnson, 763 F.3d 998, 1003 (8th Cir. 2014); see also Hill v. Walker, 737 F.3d 1209, 1216 (8th Cir. 2013) (quoting 42 U.S.C. § 12112(b)(5)(A)) ("Discrimination" under the Rehabilitation Act "includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability"). "To establish a prima facie case of disability discrimination" based on disparate treatment, "a plaintiff must show (1) that he or she was disabled; (2) that he or she was qualified to do the essential job functions with or without reasonable accommodation; and (3) that he or she suffered an adverse action due to his or her disability." Moses v. Dassault Falcon Jet-Wilmington Corp, 894 F.3d 911, 921 (8th Cir. 2018). If the plaintiff establishes a prima facie case, then the defendant must "rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action. . . . If the employer does this, then the burden of production shifts back to the plaintiff to demonstrate that the employer's non-discriminatory reason is pretextual." Fenney v. Dakota, Minnesota & E. R. Co., 327 F.3d 707, 712 (8th Cir. 2003) (cleaned up and citation omitted).

A claim concerning failure to make reasonable accommodations arises from the ADA's provision that "'discrimination' includes an employers '*not making reasonable accommodations* to the known physical or mental limitations of an otherwise qualified . . . employee, *unless* [the employer] can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.'" US Airways, Inc. v. Barnett, 535 U.S. 391, 395 (2002) (quoting 42

11

U.S.C. § 12112(b)(5)(A)); see also Peebles v. Potter, 354 F.3d 761, 767 (8th Cir. 2004). When an "employer is made aware of the legitimate need for an accommodation," the law requires it to "make a reasonable effort to determine the appropriate accommodation." Knutson v. Schwan's Home Serv., Inc., 711 F.3d 911, 915 (8th Cir. 2013) (cleaned up and citation omitted). "While job restructuring is a possible accommodation, . . . [the Eighth Circuit] has held that an employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee." Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 950 (8th Cir. 1999); see also Knutson, 711 F.3d at 916 (cleaned up and citation omitted) (holding that an employer's duty to make reasonable accommodation under the ADA does not require the employer "to reassign existing workers to assist the [disabled] employee in his essential duties").

"[A] person who is terminated after making a goodfaith request for an accommodation may pursue a retaliation claim under the ADA and the Rehabilitation Act, although the textual basis for these claims is unclear. . . . In any event, . . . retaliation claims under the two statutes [are treated] interchangeably." Withers, 763 F.3d at 1004 (cleaned up and citation omitted). "To establish unlawful retaliation . . . , [Tomshack] must show that (1) he engaged in a statutorily protected activity, (2) the employer took an adverse action against him, and (3) there was a causal connection between the adverse action and the protected activity." Id. at 1004–05 (cleaned up and citation omitted).

## III.    Discussion

### A. Disparate Treatment Claim

The parties do not dispute that Tomshack was disabled but disagree on whether Tomshack was a qualified employee under the Rehabilitation Act. Doc. 17 at 8; Doc. 27 at 10. "To be a qualified individual . . . , an employee must (1) possess the requisite skill, education, experience,

12

and training for [his] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation."  Hill, 737 F.3d at 1216 (citation omitted).  "Essential functions of a position are the fundamental duties of the job, but not its marginal functions."  Id. at 1217.  "[M]uch of the information which determines those essential functions lies uniquely with the employer. . . .  A job function may be essential if the reason the position exists is to perform that function, or if a limited number of employees are available among whom the performance of that job function can be distributed."  Id. (cleaned up and citations omitted).

"The following evidence is relevant in determining whether a job duty is an essential function: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs."  Higgins v. Union Pac. R.R. Co., 931 F.3d 664, 670 (8th Cir. 2019) (citation omitted).  "[A]n employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous."  Id. at 671 (cleaned up and citation omitted).

Tomshack argues he was a qualified employee because scheduling and working within traditional business hours were not essential job functions.  Doc. 24 at 4–6; Doc. 27 at 10.  He argues some schedulers worked on the weekends in support.  Doc. 25 at 1.  If this Court were to decide scheduling was an essential job function, he argues that he would have been qualified to schedule if the Defendants had granted his accommodation request to attend training a half-day at a time.  Doc. 27 at 10–12.  The Defendants respond that working full-time and scheduling were

essential job functions, and Tomshack was not qualified because he was not trained to schedule and could not work full-time because of his disability.  Doc. 17 at 8–10; Doc. 30 at 4–8.

The Eighth Circuit "has consistently stated that regular and reliable attendance is a necessary element of most jobs." Lipp v. Cargill Meat Sols. Corp., 911 F.3d 537, 544 (8th Cir. 2018) (clean up and citation omitted). Tomshack's position was full-time, notwithstanding that he had been effectively working part-time by using a combination of sick leave, annual leave, FMLA leave, and unpaid leave. The VA had accommodated Tomshack working this unusual schedule as a pseudo part-time program support assistant, but the VA's national priorities then changed to prioritize scheduling. Thereafter, Tomshack's supervisors told him more than once that he needed to complete the scheduling training and work full-time.  Doc. 1 at 5; Doc. 17 at 4; Doc. 18 at 5, Doc. 24 at 2; see Higgins, 931 F.3d at 670 (8th Cir. 2019) (holding an employer's repeated warning that an employee's "poor attendance was unacceptable" indicated that consistent job attendance was an essential element of the employee's position).  Reliable and consistent attendance during the workday was not nonessential to Tomshack's position merely because the Defendants allowed Tomshack to adopt a flexible, part-time schedule for two-plus years. See Rehrs v. Iams Co., 486 F.3d 353, 358 (8th Cir. 2007) (cleaned up and citation omitted) ("[A]n employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous.").  Tomshack could not perform the essential functions of his position as a full-time program support assistant with scheduling responsibilities and therefore was not a qualified employee under the Rehabilitation Act.  See Treanor v. MCI Telecommunications Corp., 200 F.3d 570, 575–76 (8th Cir. 2000) (holding an

14

employee who sought part-time work was not a qualified employee under the ADA and thus failed to make a prima facie case when only full-time positions were available).

Further, Tomshack cannot show that he suffered an adverse employment action due to his disability. Tomshack claims that he was constructively discharged. Doc. 1 at 6; Doc. 27 at 2. "A plaintiff claiming constructive discharge must show that a reasonable person would have found the conditions of employment intolerable and that the employer either intended to force the employee to resign or could have reasonably foreseen that the employee would do so as a result of its actions." Fenney, 327 F.3d at 717 (cleaned up and citations omitted); see also Green v. Brennan, 578 U.S. 547, 555 (2016) (cleaned up and citation omitted) ("A plaintiff must prove . . . that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign . . . [and] show that he actually resigned" to support a constructive discharge claim.). The Eighth Circuit has held "that an employee's being told that he or she will be fired for cause does not, in and of itself, constitute constructive discharge." Summit v. S-B Power Tool, (Skil Corp.), a Div. of Emerson Elec. Co., 121 F.3d 416, 421 (8th Cir. 1997).

Tomshack has not alleged that his working conditions were intolerable. Tomshack's supervisors accommodated him by allowing him to work what was effectively part-time in the years before his reluctantly-made resignation. Doc. 17 at 2; Doc. 18 at 4. Tomshack's supervisors also met with him several times to discuss the need to work full-time and complete scheduling, to consider his accommodation request, to offer him a part-time position in a different department, and to remind him of upcoming scheduling training. Doc. 17 at 4; Doc. 18 at 5.

Tomshack, however, maintains that after Seeley dismissed his training accommodation request and admonished him that he must attend training, she said that he must resign or be fired.

15

Doc. 1 at 6; Doc. 27 at 7. Even if Seeley's statement were taken to be a discharge of Tomshack, he cannot show a causal relationship between that discharge and his disability. Generally but not exclusively, a plaintiff may show the Defendants' proffered nondiscriminatory reasons for any adverse employment actions are pretextual "by showing that an employer (1) failed to follow its own policies, or (2) treated similarly-situated employees in a disparate manner . . . . Whether the employees are 'similarly situated' is a rigorous test because the employees used for comparison must be similarly situated in all relevant respects." Prod. Fabricators, Inc., 763 F.3d at 970 (cleaned up and citation omitted).

The Defendants have proffered Tomshack's failure to work full-time, attend training, and schedule as nondiscriminatory reasons for any alleged adverse employment action. Doc. 17 at 8–10. There is no genuine dispute that Tomshack failed to perform in these ways. Tomshack nonetheless attempts to show these reasons are pretextual by asserting generally that other "similarly situated" employees were given much more "leeway with their work schedules" and were not terminated. Doc. 1 at 10. But there is no disparate treatment evidence at all in the record.

"The party opposing summary judgment 'may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" Simpson v. Des Moines Water Works, 425 F.3d 538, 541–42 (8th Cir. 2005) (quoting R. Civ. P. 56(e)); see also Young v. Warner-Jenkinson Co., 152 F.3d 1018, 1021 (8th Cir. 1998) (cleaned up and citation omitted) (In resisting a motion for summary judgment, "a nonmoving party may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial."). Tomshack has offered no evidence that other program support assistants were allowed to work part-time or to forego scheduling training. Tomshack was the only program support assistant who did not attend the mandatory training. Doc.

16

19-2 at 9. And Tomshack himself acknowledged that his reluctant resignation stemmed from his inability to work full-time and attend training, rather than from any discriminatory treatment by the Defendants. Doc. 1 at 6; Doc. 17 at 5; Doc. 18 at 7. Further, the Defendants knew for years about Tomshack's disability and accommodated him for more than two years by allowing him to work what was effectively a part-time schedule through a creative use of various forms of leave. See Prod. Fabricators, Inc., 763 F.3d at 969–70 (holding that a plaintiff failed to show that he suffered an adverse employment action because of his disability when his employer knew of his shoulder injury for a year before it terminated him and accommodated his disability for that year by "moving him to a less physically demanding position in line with his new work restrictions . . . [and granting] him leave for his medical appointments"). On this record, Tomshack has no viable disparate treatment claim as a matter of law.

## B. Failure to Make Reasonable Accommodations Claim

US Airways, Inc. v. Barnett, 535 U.S. 391 (2002), is the only Supreme Court case that discusses a failure to accommodate claim. Exby-Stolley v. Bd. of Cnty. Commissioners, 979 F.3d 784, 825 (10th Cir. 2020) (McHugh, J., dissenting). In Barnett, a US Airways employee injured his back and consequently was transferred to a less physically demanding position in the mailroom. 535 U.S. at 393. The employee's new position "became open to seniority-based employee bidding . . . [u]nder US Airways' seniority system," and the employee submitted an accommodation request to keep his job. Id. at 394. The employee lost his job after US Airways denied his request. Id. at 395. The employee then brought a claim under the ADA alleging that US Airways failed to provide a reasonable accommodation for his disability. Id.

The Supreme Court in Barnett relied on the text of the ADA in interpreting the employee's claim, stating that "the ADA says that 'discrimination' includes an employer's '*not making*

17

*reasonable accommodations* to the known physical or mental limitations of an otherwise qualified
. . . employee, *unless* [the employer] can demonstrate that the accommodation would impose
an *undue hardship* on the operation of [its] business.'" Id. at 396 (quoting 42 U.S.C.
12112(b)(5)(A)).    The Supreme Court continued that an employee bringing a failure to
accommodate claim must "show that an 'accommodation' seems reasonable on its
face, *i.e.,* ordinarily or in the run of cases."    Id. at 402.    Upon such a showing, "the
defendant/employer then must show special (typically case-specific) circumstances that
demonstrate undue hardship in the particular circumstances."    Id.

In Peebles v. Potter, the Eighth Circuit distinguished between disparate treatment claims
and failure to accommodate claims under the ADA.  354 F.3d 761 (8th Cir. 2004).  "The failure to
make reasonable accommodations in the employment of a disabled employee is a separate form of
prohibited discrimination" from an intentional act of discrimination at issue in a disparate
treatment claim.    Id. at 766.    Unlike disparate treatment claims, a failure to make reasonable
accommodations claim "does not turn on the employer's intent or actual motive."    Id.  "Rather,
discrimination occurs when the employer fails to abide by a legally imposed duty.  The known
disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that
duty, we do not care if he was motivated by the disability."    Id at 767.    Peebles also adopted the
test set forth in Barnett for a reasonable accommodation claim, holding that to survive a motion
for summary judgment, an employee must only "show that the requested accommodation is
'reasonable on its face, *i.e.,* ordinarily or in the run of cases.' . . .  Upon such a showing, the
employer is left to 'show special (typically case-specific) circumstances that demonstrate undue
hardship in the particular circumstances.'"    Id. at 768 (quoting Barnett, 535 U.S. at 401–02).

Since Peebles, the Eighth Circuit has reiterated that a failure to provide reasonable accommodations is a discriminatory act itself and therefore reasonable accommodation claims are analyzed under a modified McDonnell Douglas framework. See Mershon v. St. Louis Univ., 442 F.3d 1069, 1074, 1077 n.5 (8th Cir. 2006) (cleaned up and citations omitted) ("We analyze claims of failure to accommodate under a modified burden-shifting analysis, because a discriminatory intent is not at issue. . . . [An] alleged failure to accommodate is [an] adverse action[, so] . . . there is no requirement to demonstrate any adverse action other than the failure to accommodate itself."); Dick v. Dickinson State Univ., 826 F.3d 1054, 1059 (8th Cir. 2016) (cleaned up and citation omitted) ("[A]n employer's denial of a request for a reasonable accommodation,   .   .   .   is a *discrete act* of discrimination that is an *independently actionable* unlawful employment practice under the ADA or the Rehabilitation Act."); see also Exby-Stolley, 979 F.3d at 806 (cleaned up and citation omitted) (stating the Third and Eighth Circuits "typically have purported to incorporate an adverse-employment-action requirement into ADA failure-to-accommodate claims . . . [citing Dick v. Dickinson State Univ., 826 F.3d at 1060] . . . . But they do so in name only—that is, in a manner that is essentially form, rather than substance . . . because these circuits classify *a failure to accommodate* as an adverse 'action.'").

While the Eighth Circuit has not overruled its analysis in Peebles, it has analyzed reasonable accommodation claims under the McDonnell Douglas framework for disparate treatment cases by considering whether an employee suffered adverse employment action because of an employer's alleged failure to accommodate and by considering whether an employer had discriminatory intent. See, e.g., Huber v. Wal-Mart Stores, Inc., 486 F.3d 480, 482 (8th Cir. 2007) (requiring an employee to show that she suffered an adverse employment action because of her disability on a reasonable accommodation claim); Kallail v. Alliant Energy Corp. Servs., Inc., 691

F.3d 925, 930 (8th Cir. 2012) (failing to distinguish between the requirements for a disparate treatment claim and a reasonable accommodation claim under the ADA). These cases cite Fenney, which predates Peebles and holds an employee must show that she suffered an adverse employment action, beyond a failure to accommodate the employee, to be entitled to relief on a reasonable accommodation claim. Fenney, 327 F.3d at 711–12; see also Nicole B. Porter, *Adverse Employment Actions in Failure-to-Accommodate Claims: Much Ado About Nothing*, NYU L. Rev. Online 1, 10 (2019), https://www.nyulawreview.org/wp-content/uploads/2020/01/Porter1.pdf (stating that the Fenney Court "recognized that disparate treatment claims are treated differently from failure-to-accommodate claims when it comes to the allocations of burdens of proof," but "then stated the plaintiff must first make a facial showing that . . . he has suffered an adverse employment action" on a failure to accommodate claim).

Most recently, the Eighth Circuit adopted a new test for reasonable accommodation claims, which varies from the modified McDonnell Douglas framework in Peebles and instead requires an employee to present a prima facie case under the McDonnell Douglas framework *and* to show that the employer failed to accommodate them. E.g., Kelleher v. Wal-Mart Stores, Inc., 817 F.3d 624, 631 (8th Cir. 2016) (cleaned up and citation omitted) ("To support her failure to accommodate claim, [a plaintiff] must establish both a prima facie case of discrimination based on her disability and a failure to accommodate it."); Schaffhauser v. United Parcel Serv., Inc., 794 F.3d 899, 905 (8th Cir. 2015) (same); Moses, 894 F.3d 911, 923 (8th Cir. 2018) (same); Gardea v. JBS USA, LLC, 915 F.3d 537, 541 (8th Cir. 2019) (same); but see Garrison v. Dolgencorp, LLC, 939 F.3d 937, 941 (8th Cir. 2019) (citing Fjellestad, 188 F.3d at 951–52, and providing another test for reasonable accommodation claims in which an employee must prove (1) she was disabled, (2) she requested an accommodation, (3) the employer failed to engaged in an interactive process to

20

accommodate the employee's disability, and (4) a reasonable accommodation was possible if an interactive process took place). In short, the elements of a reasonable accommodation claim are unclear under Eighth Circuit precedent.

Other circuits have distinguished failure to accommodate claims from disparate treatment claims under the ADA. See, e.g., Scheidler v. Indiana, 914 F.3d 535, 541 (7th Cir. 2019); Doak v. Johnson, 19 F. Supp. 3d 259, 273–74 (D.D.C. 2014) ("In the D.C. Circuit, failure to accommodate claims are not subject to the *McDonnell Douglas* burden-shifting framework."); Exby-Stolley, 979 F.3d at 796 (citing Barnett, 535 U.S. at 397, and Peebles, 354 F.3d at 767) ("[D]isparate-treatment claims under the ADA allege that the employer discriminated against the employee by *acting* in a discriminatory manner. . . .    On the other hand, failure-to-accommodate claims do not allege that the employer *acted*, but rather that the employer *failed to act*.").

Recently, in Exby-Stolley v. Bd. of Cnty. Commissioners, 979 F.3d 784 (10th Cir. 2020) (en banc), the Tenth Circuit thoroughly reviewed the conflict and confusion among the circuits concerning the differences between a disparate treatment claim and a reasonable accommodation claim, specifically whether a reasonable accommodation claim requires proof of an adverse employment action. In a split decision, the Tenth Circuit adopted what it considered to be the majority view: that a reasonable accommodation claim did not require proof of an adverse employment action. Exby-Stolley, 979 F.3d at 795. The Tenth Circuit further stated that "incorporation of an adverse-employment-action requirement into an ADA failure-to-accommodate claim [is] contrary to (1) [Tenth Circuit] controlling precedent; (2) the inherent nature of a failure-to-accommodate claim, as contrasted with a disparate-treatment claim; (3) the general remedial purposes of the ADA; (4) the EEOC's understanding of the elements of

21

an ADA failure-to-accommodate claim; and (5) the regularly followed practices of all of our sister circuits." Id. at 791–92. "[N]o less than six circuits—the First, Fourth, Fifth, Sixth, Eleventh, and the D.C. Circuit—either state, or strongly suggest, that there is no adverse-employment-action requirement in ADA failure-to-accommodate claims." Id. at 804 (cleaned up and citation omitted). "Any attempt to incorporate an adverse-employment-action requirement into an ADA failure-to-accommodate claim likely stems from confusion in failing to clearly differentiate between disparate treatment and failure to accommodate claims . . . ." Id. at 795 (cleaned up and citation omitted).

While there is disagreement and confusion about whether a reasonable accommodation claim requires proof of an adverse employment action, courts are clear that a plaintiff bringing a reasonable accommodation claim must be a "qualified employee." See Dick, 826 F.3d at 1059 (holding an employer has a duty to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability"); Mershon, 442 F.3d at 1077 (holding a plaintiff bringing a reasonable accommodation claim has the burden of showing such an accommodation "would render him otherwise qualified" under the ADA); E.E.O.C. v. AutoZone, Inc., 809 F.3d 916, 919 (7th Cir. 2016) (quoting 42 U.S.C. § 12111(8)) (holding that an employee bringing a reasonable accommodation claim must be a "qualified individual" under the ADA, in that she "with or without reasonable accommodation, can perform the *essential functions* of the employment position"); Doak, 19 F. Supp. 3d at 273–74 (same); Trahan v. Wayfair Maine, LLC, 957 F.3d 54, 64 (1st Cir. 2020) (same); 1 AMERICANS WITH DISABILITIES: PRACTICE & COMPLIANCE MANUAL § 1:265, Westlaw (updated November 2021) ("To establish a prima facie case of failure to accommodate under § 504 of the Rehabilitation Act[] in the employment context,

22

the employee must establish . . . that with reasonable accommodation the employee could perform the essential functions of the position . . . .").

Because Tomshack is not a qualified employee for the reasons discussed earlier, his claim fails whether it is reviewed under the McDonnell Douglas framework of a disparate treatment claim or under the modified McDonnell Douglas framework set forth in Peebles. Tomshack requested an accommodation to attend training on a part-time basis and work part-time. Doc. 1 at 6; Doc. 17 at 3–4; Doc. 18 at 4. However, as discussed, working full-time was an essential function of Tomshack's position. Tomshack was not qualified for his position because he was not able to work full-time even if the Defendants granted his accommodation request to attend training on a part-time basis. "An employee who is unable to come to work on a regular basis is unable to satisfy any of the functions of the job in question, much less the essential ones. . . . If an accommodation would leave the employee unable to perform an essential job function -- here, regular attendance -- her accommodation claim fails." Evans v. Coop. Response Ctr., Inc., 996 F.3d 539, 546–47 (8th Cir. 2021) (cleaned up and citations omitted). See also Dick, 826 F.3d at 1060 (cleaned up and citations omitted) ("A reasonable accommodation is one which enables an individual with a disability to perform the essential functions of the position. . . . This does not mean the employer must hire additional employees, . . . give other employees more work, . . . or give the disabled employee indefinite leave . . . ."); Tyndall v. Nat'l Educ. Centers, Inc. of California, 31 F.3d 209, 213 (4th Cir. 1994) ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA."); Waggoner v. Olin Corp., 169 F.3d 481, 485 (7th Cir. 1999) ("[A]n employee with a history of sporadic unpredictable absences is not otherwise qualified."); Lamb v. Qualex, Inc., 33 F. App'x 49, 56–57 (4th Cir. 2002) (cleaned up and citations omitted) ("An employee who cannot

23

meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA. . . . Consequently, a plaintiff who can work only on a part-time basis cannot be a 'qualified individual with a disability' if the ability to work full-time is essential to his job."); Green v. BakeMark USA, LLC, 683 F. App'x 486, 491–92 (6th Cir. 2017) ("[W]hile a part-time work schedule may be a reasonable accommodation in some cases, . . . it is unreasonable in situations where the essential functions of the job require full-time attendance.").

As part of his reasonable accommodation claim, Tomshack also alleges that the Defendants failed to engage in an interactive process. Doc. 1 at 10. "To show that an employer failed to participate in the interactive process, an employee must show that: (1) the employer knew of the employee's disability; (2) the employee requested accommodations or assistance; (3) the employer did not in good faith assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Kallail, 691 F.3d at 933. See also 1 AMERICANS WITH DISABILITIES: PRACTICE & COMPLIANCE MANUAL § 1:265, Westlaw (updated November 2021). "There is no *per se* liability under the ADA if an employer fails to engage in an interactive process, but the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is *prima facie* evidence that the employer may be acting in bad faith." Kallail, 691 F.3d at 933 (cleaned up and citation omitted). It is unnecessary to consider whether the Defendants failed to engage in an interactive process because Tomshack does not have a viable reasonable accommodation claim.[3] See Hill, 737 F.3d at 1218 (holding a plaintiff did not create a genuine issue on whether her employer failed

---

[3] Defendants appeared to have engaged in such an interactive process through the September 18, 2017, and October 3, 2017, meetings among Seeley, EEO Manager Diane Maeschen, and Tomshack.

24

to engage in an interactive process when she could "not perform the essential functions of her position, with or without reasonable accommodation").

## C. Retaliation Claim

A retaliation claim requires an employee to show that "(1) he engaged in a statutorily protected activity, (2) the employer took an adverse action against him, and (3) there was a causal connection between the adverse action and the protected activity." Withers, 763 F.3d at 1004–05 (cleaned up and citation omitted). Requesting a reasonable accommodation is a protected activity. Kirkeberg v. Canadian Pac. Ry., 619 F.3d 898, 907–08 (8th Cir. 2010). Further, "[a]n individual who is adjudged not to be a qualified individual with a disability may still pursue a retaliation claim under the ADA as long as he had a good faith belief that a requested accommodation was appropriate." Id. at 907 (8th Cir. 2010) (cleaned up and citation omitted). "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine issue of fact on retaliation." Prod. Fabricators, Inc., 763 F.3d at 973.

Tomshack alleges he was given a poor performance review and notice of deficiencies in retaliation for requesting an accommodation. Doc. 1 at 6; Doc. 27 at 20. The Defendants offered Tomshack's failure to schedule, work full-time, and attend training as nondiscriminatory reasons for the alleged adverse employment actions. Doc. 17 at 13–14. Tomshack has not offered any evidence to show these reasons are pretextual. To the contrary, he admitted his inability to attend training and work full-time in his resignation letter. Doc. 1 at 6; Doc. 17 at 5; Doc. 18 at 7. The emails between Seeley and other administrators at the Veterans' Hospital discussing Tomshack's resignation request also do not suggest that the Defendants had any intent to retaliate or discriminate against Tomshack. Doc. 26-9 at 2–4. See Prod. Fabricators, Inc., 763 F.3d at 974

(affirming summary judgment on an employee's retaliation claim when the employee had not shown that his employer's nondiscriminatory reasons for terminating him were pretextual).

Tomshack also alleges he was required to work-full time in retaliation for requesting to attend training on a part-time basis. Doc. 1 at 6; Doc. 27 at 20. However, it is not an adverse employment action to require an employee to perform the essential functions of his position. See Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs., 728 F.3d 800, 804 (8th Cir. 2013) ("An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects . . . ."). Even when reviewing the facts in the light most favorable to Tomshack, he has not shown that he suffered any adverse employment actions in retaliation to requesting an accommodation.

## IV.    Conclusion and Order

Because Tomshack does not have a viable disparate treatment claim, failure to accommodate claim, or retaliation claim, it is hereby

ORDERED that the Defendants' motion for summary judgment, Doc. 16, is granted.

DATED this 10th day of February, 2022.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

26